STATE of Minnesota, Respondent,

v.

Mwati Pepi McKENZIE, Appellant.

No. C8–94–94.

Supreme Court of Minnesota.

May 19, 1995.

Michael F. Cromett, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

GARDEBRING, Justice.

Mwati Pepi McKenzie was convicted of first-degree murder of Minneapolis police officer Jerry Haaf in October 1993 and sentenced to life imprisonment pursuant to Minn.Stat. § 609.185(4). On appeal to this court, McKenzie alleges: 1) that he was denied his state constitutional right to waive a 12 person jury in favor of a six person jury; 2) that he was denied the right to a fair trial by the trial court's decision to impanel an anonymous jury; 3) that the jury selection procedure denied him his right to a trial by an impartial jury under the Minnesota Constitution; 4) that the trial court's instruction on aiding and abetting constituted reversible error; and 5) that the evidence presented at trial was insufficient as a matter of law to support the conviction. We affirm.

The relevant facts in the record are as follows. Two or three black men walked into the Pizza Shack restaurant in South Minneapolis at approximately 1:30 a.m. on September 25, 1992.[1] Officer Haaf, in full uniform, was seated at a table with two other patrons, including a police reservist riding along with Haaf that evening. The men approached Haaf from behind and shot him twice in the back while he sat reading a newspaper. Haaf died from the gunshot wounds. No witnesses were able to identify the gunmen.

McKenzie was linked to the shooting by the testimony of several witnesses at the trial. Their testimony supported the state's theory that McKenzie and other members of the Vice Lords gang shot Haaf.[2] "Richard," a juvenile member of the Vice Lords gang testified that on the evening of September 24, 1992, he and McKenzie went to the home of Vice Lord leader Sharif Willis. Richard testified that A.C. Ford ("Ford") was at Willis' when he arrived. Other gang members, including Shannon Bowles ("Bowles") and Montery Willis, arrived and Ford suggested shooting a bus driver. Montery Willis said that was crazy, to which Ford said, "Let's do the Pizza Shack." Bowles had a gun and Ford gave McKenzie a gun-shaped bag from the freezer. Richard and McKenzie left Willis' apartment, and, in another automobile, followed a white Ford Bronco automobile carrying Ford, Bowles and Montery Willis. McKenzie told Richard, "We're going to the Pizza Shack and kill a cop." When they arrived in the vicinity of the restaurant, McKenzie jumped out of the car driven by Richard, Bowles jumped out of the Bronco and they headed toward the Pizza Shack on foot.

Richard circled the block several times and eventually parked and walked toward the Pizza Shack when he saw a police car nearby. He watched for two or three minutes and then went back to his car and drove to the home of Ed Harris, another gang member who lived nearby. McKenzie and Bowles were at Harris' house. They were wearing different shirts, hats and shoes than when he had last seen them walking toward the Pizza Shack. McKenzie told Richard he thought he had shot a cop.

Loverine Harris, wife of Ed Harris, testified that on the morning of the shooting, McKenzie and Bowles came to the Harris home and said they had just shot a crippled man. They asked for a change of clothes and for a place to hide their guns. McKenzie

---

1. Several people saw two men, but one Pizza Shack employee testified that she saw three men come into the restaurant.

2. In separate trials Shannon Noah Bowles and A.C. Ford, were both convicted of premeditated first-degree murder under Minn.Stat. § 609.185(1) (1994), first-degree murder of a peace officer under Minn.Stat. § 609.185(4) (1994) and attempted first-degree murder under Minn.Stat. § 609.17 (1994).

and Bowles wrapped the guns in their shirts. Ed Harris then put the wrapped guns in a bag and hid the bag in the attic. McKenzie and Bowles also washed their hands. Loverine Harris testified that when Richard arrived, some 20 to 30 minutes after McKenzie and Bowles, he looked surprised to see them, and indicated that he was supposed to pick them up after they "shot the police."

The police arrived at the Harris house after McKenzie and Bowles had left. The officers searched the Harris house with their permission and found no incriminating evidence. Later that day, or early the next day, a gang member who lived across the street from the Harris house removed the guns and clothing from the attic.

Loverine Harris also testified that on October 8, 1992, Sharif Willis came to the Harris home looking for Ed Harris. The next day Ed Harris went out with Richard, and Larry Flournoy, Lee Rockymore and Steve Banks, also Vice Lord members. Later on October 9, Richard and Flournoy returned to the Harris house and Richard told Loverine Harris that Ed was on a mission and was missing. On October 10, 1992, police informed Loverine Harris that her husband had been murdered. Later that morning, Loverine Harris went to the police station to talk with the authorities about her husband and the Pizza Shack shooting. She told police, and testified at trial, that Pepi McKenzie and another man she didn't know came to her house the night the policeman was shot. While in the policeman's office, Loverine glanced up at a line of pictures on the wall and stated, "That's him. * * * That man right there, that's the man that was in my house with [Pepi] the night that the police was shot." The picture was of Shannon Bowles.

Loverine Harris' testimony was supported in part by the testimony of Olivia Gregory, a defense witness. Gregory, who was Ed Harris' cousin and Loverine Harris' friend, testified that Loverine Harris told her that two men came to the house on the night of the shooting with blood on their clothes, that one of them was Sharif Willis' nephew and the other was a man whom she did not know, and that Ed Harris had been killed because he knew the details of the murder.[3]

In addition, Eugene McDaniel, a former Vice Lord who had been in police custody at the time of the Haaf murder, testified about the gang's activities, the storing of guns in a freezer at Sharif Willis' house and the gang's ownership of a white Ford Bronco. McDaniel also testified that after the Haaf murder, Bowles told him that he and Montery Willis did "the cop thing" and that's why he was leaving town. Also, A.C. Ford laughingly told McDaniel, "They got the wrong people * * * Ice [Montery Willis] don't even fit the description of the people that did that."

There was also testimony from Wyvonia Williams, who met McKenzie in Chicago in late September or early October 1992. Williams was living with a relative of Sharif Willis in Illinois when McKenzie and Montery Willis came to stay at the house during late September or early October. On December 9, 1992 and March 10, 1993, Williams was questioned by Minneapolis and Chicago police officers, which resulted in her signed statement implicating McKenzie in the shooting. In May 1993, Williams testified as a state's witness in the A.C. Ford trial and in June 1993 she was a defense witness in the Bowles trial. In both her police statement and testimony given in the Ford and Bowles trials, Williams stated that McKenzie told her he was a part of the shooting. However, at McKenzie's trial Williams testified that her police statement was the result of threatening and coercive police interrogation and it incorrectly implicated McKenzie in the shooting. Williams further testified that her testimony at the two previous trials implicating McKenzie was also incorrect because it was based on her police statement.

However, Williams did testify at McKenzie's trial that he was uneasy in Sharif Willis' presence and was afraid he would be killed when he returned to Minneapolis to turn himself in. She also testified that McKenzie told her that if he was killed, she was supposed to tell police that he had been at a Vice

---

3. On November 19, 1993, Larry Jerome Flournoy, a Vice Lord, was convicted for the first-

degree murder of Edward Harris following a jury trial.

Lord meeting at which Sharif Willis ordered the "hit" on a police officer which Ford was supposed to carry out, and that Montery Willis was supposed to kill McKenzie because he didn't carry out his part. Further, Williams' testimony from the previous trials was read to the jury with an instruction that it was to be considered as substantive evidence, and the jury received a written copy of her police statement which they were instructed to consider only as impeachment evidence.

The key witnesses for the prosecution all benefitted from their testimony in the McKenzie trial. In exchange for Richard's testimony, the state agreed not to seek to certify him as an adult and to relocate his family. Likewise, Loverine Harris and her family were also relocated. McDaniel's state charge for a 1992 aggravated robbery was dismissed and he was told he would receive a recommendation for a reduced sentence for a federal firearm charge.

The defense called four witnesses.[4] First, Mary Gunn from the Minnesota Bureau of Criminal Apprehension Forensic Science Laboratory testified that blood and hair tests conducted on various evidence were inconclusive. Next, two neighborhood friends of the Harrises, Eddie Ray Williams and his live-in girlfriend, Olivia Gregory testified. Williams testified that he knew Ed Harris for about a year and a half. Williams said he used to go over to the Harris' house on a daily basis and "Richard" was often there, but he never saw McKenzie. At the time of the shooting Williams was with a friend. Gregory testified that she had grown up with [her cousin] Ed Harris and was good friends with Loverine Harris. She stated that she often went over to the Harris' house, but she had never seen McKenzie there. Gregory said Loverine Harris told her that Ed was killed because he knew about Haaf's murder. Finally, the defense called Jeffrey Graves, a long time friend of Ed Harris. Graves testified that he knew "Richard" and knew he had carried a gun in the past. Graves was in jail

at the time the police questioned him about the Harris murder.

The trial itself was significantly shaped by certain trial court decisions raised on appeal here, especially on matters relating to the jury. The trial court denied the defense motions for a change of venue and for a venire panel chosen from the neighborhood surrounding the crime scene. Of particular concern to the defense was the fact that only 25 percent of the persons summoned for the jury pool responded. Further, during the voir dire process, three otherwise qualified jurors who were financially unable to sit were, at their own request, excused from service. In addition, one juror asked to be excused for personal and financial hardship on the first day of trial. Overall, 59 potential jurors went through voir dire, which extended from September 1, 1993 until September 30, 1993. During voir dire, defense counsel challenged the venire as not being representative of a fair cross-section of the community. The trial court made a finding that the jury pool was properly selected at random using the broadest feasible cross-section of the population of the area served by the court.

The trial court also authorized the use of an anonymous jury over the objections of the defense. At a pre-trial hearing on August 13, 1993, defense counsel asked the trial court if it intended to use an anonymous jury. At that time, no objections were made and the court took the matter under advisement. On August 30, 1993, the trial court gave a preliminary instruction to the entire jury pool of 59. It included an explanation for the use of anonymity which had been prepared by defense counsel. At that time the trial court said:

> Your names, but not your addresses or phone numbers, will be known to myself and my staff and the attorneys only. Again, the reason for this is to make sure that you are not bothered by anyone, whether it's the media or anyone else with an interest in this case, trying to have any kind of influence on you. We are proceed-

---

4. Additionally, Benjamin Mitchell's testimony, given as a state witness in the Ford and Bowles trials, was read into evidence. Mitchell testified that on the night of September 24, 1993, "Richard" paid him $20 to use his car for a couple of hours.

ing in this way to make absolutely sure that each juror who decides the case does so solely on the evidence produced in court and under the rules of law and evidence as they will be applied.

Understand that you are not to infer from this procedure or anything else, any other procedure used during the course of this trial, anything about anybody involved in the case. The only thing that matters again is the evidence to be produced and the law to be applied.

Following the instructions, the court held a hearing with counsel to determine whether impanelling an anonymous jury was appropriate. Although neither party made a motion concerning the impanelling of an anonymous jury, the court ordered the jury to remain anonymous.[5] In making its decision, the trial court noted that the two preceding trials concerning the murder of Officer Haaf impanelled anonymous juries. The court indicated that although there was no evidence of jury tampering during those trials, there was still a continuing concern over safety and outside influence stemming from the circumstances surrounding the murder of Vice Lord Ed Harris. The court also indicated that the amount of media attention and the presence of demonstrators outside the courthouse was a concern. The defense counsel objected to the court's decision and submitted a proposed instruction, to which the state agreed, that the trial court read to each individual potential juror immediately prior to voir dire. That instruction said:

This case could receive considerable publicity, in the newspapers, on the radio, and on television. The media and members of the public may be curious about the identity of the participants, the witnesses, the lawyers, and the jurors. As a result the jury might be exposed to opinions, comments, and inquiries which could impair its ability to be impartial. The Court does not wish to allow such outside influences to divert the jury's attention from the evidence or to cause people to pry into the personal affairs of the jurors.

Thus, the Court has decided that your name, address, and place of employment will remain anonymous. That is why you have received numbers. Anonymity will ward off curiosity that might infringe on a juror's privacy and will insulate the jury from improper influence that might interfere with its sworn duty to judge the evidence fairly. Do you have any problem with that instruction as I gave it to you, ma'am/sir?

After voir dire had begun and seven jurors, including one alternate, had been selected, defense counsel moved to waive a trial by 12 jurors and instead have a trial by six. The trial court granted defense counsel's motion, and the state appealed. The court of appeals reversed and this court subsequently denied the petition for further review.

At the close of evidence there was an off-the-record chambers discussion about jury instructions. While no record was made of this substantive discussion, both defense counsel and the state filed affidavits reflecting their understanding of the discussion in connection with the defense motion for a new trial. Although they differ as to their conclusions, both affidavits reflect that defense counsel both objected to the state's proposed instruction on aiding and abetting and also proposed certain aiding and abetting instructions based on federal instructions. According to the state's affidavit, certain modifications were made to the instructions and no further objections were raised. The defense says it's objection was essentially a continuing one.

The trial court instructed the jury on aiding and abetting, as follows:

Defendant is liable for the crimes of another person when defendant has intentionally aided the other person in committing a crime, or has intentionally advised, counseled or conspired with another person to commit it. Defendant is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by him as a probable consequence of committing or attempting to commit the crime intended.

---

**5.** The trial judge specifically allowed counsel to have access to the names and pertinent biographical data of each juror, but did not disclose the addresses or phone numbers.

In order to aid and abet another to commit a crime, it is necessary that the defendant willfully participate in it as he would in something that he wishes to bring about; that is to say, that he willfully seek by some act of his to make the criminal venture succeed. The defendant's participation in the crime in order to aid and abet must be more than mere inaction or passive approval. It is, however, proper for the jury to consider the defendant's passive conduct in connection with other circumstances in determining whether the defendant, by his presence, intended to aid and abet another in committing the offense. In determining whether the defendant intended to "aid or abet" another, you may consider whether he in some way, by word or deed, intentionally participated in the murder of Officer Haaf or in some way encouraged or aided the co-defendants in committing the murder.

You, of course, may not find defendant guilty unless you find beyond a reasonable doubt that every element of each offense as defined in these instructions was committed by some person or persons, and that the defendant participated in its commission.

In deciding whether the defendant is guilty or not guilty of aiding or abetting in the commission of a crime, you may consider:

One, his presence or absence at the scene of the crime;

Two, his conduct before the commission of the crime;

Three, his participation in the crime;

Four, his lack of objection to the commission of the crime;

Five, his actions after the commission of the crime.

If defendant aided, advised, hired or requested the commission of a crime by another person, and that crime was committed, defendant is guilty of the crime. You are not to concern yourselves with what action, if any, was taken against the other person.

The trial court denied appellant's motion for a new trial and this appeal was initiated.

## I. WAIVER OF TWELVE PERSON JURY

■ The first issue we address is whether a criminal defendant can unilaterally waive a 12 person jury in favor of a six person jury. After voir dire had begun and seven jurors, including one alternate, had been selected, defense counsel made a motion to waive a trial by 12 jurors and instead have a trial by six. The trial judge granted the motion and the state appealed. On an expedited appeal, the court of appeals concluded that Minn. R.Crim.P. 26.01, subd. 1(4), prevents a defendant from unilaterally reducing the jury size, and voir dire was completed to select the remaining five jurors.

McKenzie argues that Minnesota Constitution Article I, Section 6, provides the accused the right to unilaterally waive a 12–person jury. We do not agree. Article I, Section 6, of the Minnesota Constitution (1995) states in relevant part:

In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the county or district wherein the crime shall have been committed * * *. In all prosecutions of crimes defined by law as felonies, the accused has the right to a jury of 12 members. In all other criminal prosecutions, the legislature may provide for the number of jurors, provided that a jury have at least six members.

However, the constitution is silent on the waiver issue. We have said that the right to waive a jury trial entirely is governed by statute, not by the constitution. *State v. Hoskins*, 292 Minn. 111, 118, 193 N.W.2d 802, 808 (1972).[6] Under Criminal Procedure Rule 26.01,[7] which superseded the statute dis-

6. The court in *Hoskins* refers to the waiver provisions in Minn.Stat. § 631.01 as being controlling, however the statute was repealed in 1979 and superseded by the Rules of Criminal Procedure. *See Hoskins*, 292 Minn. at 119, 193 N.W.2d at

809; Minn.Stat. § 631.01 (1974); Minn. R.Crim.P. 26.01, subd. 1(2).

7. Minn.R.Crim.P. 26.01, subd. 1(2), provides:

cussed in *Hoskins*, a defendant does not have an absolute right to waive a jury but rather the trial court has discretion in deciding whether to require a trial by jury. *State v. Linder*, 304 N.W.2d 902, 904–05 (Minn.1981); *State v. Kilburn*, 304 Minn. 217, 224–25, 231 N.W.2d 61, 65 (1975). We believe the logic in *Hoskins* applies to the right to reduce the jury size, as well. Here the issue is governed by Minn.R.Crim.P. 26.01, subd. 1(4) (emphasis added) which provides in relevant part:

> At any time before verdict, **the parties, with the approval of the court, may stipulate that the jury shall consist of a lesser number** than that provided by law. The court shall not approve such a stipulation unless the defendant, after being advised by the court of the right to trial by a jury consisting of the number of jurors provided by law, personally in writing or orally on the record in open court agrees to trial by such reduced jury.

The plain language of the provision requires **both** parties and the court to agree to the reduction in jury size. We decline to look beyond the clear language of Rule 26.01. Both parties, the defendant and the state, have an interest and a right to insist upon a 12 person jury. In this case, the state refused to stipulate to a reduced number of jurors, thus Rule 26.01 dictates that the jury consist of the number provided by law.

■ Defendant also argues, and the trial court agreed, that Rule 26.01, subd. 1(4) is inconsistent with and must yield to Jury Management Rule 802(i) (1992), which provides in relevant part:

> "Petit jury" means a body of six persons, impanelled and sworn in any court to try and determine, by verdict, any question or issue of fact in a civil or criminal action or

proceeding, according to law and the evidence as given them in court. In a criminal action where the offense charged is a felony, a petit jury is a body of 12 persons, unless the defendant consents to a jury of six.

*See* Minn.Gen.R.Prac. 802(i) (1992). We are not persuaded by this argument for several reasons. First, there is no apparent conflict between the two rules. The Jury Management Rule allows the defendant to consent to less than 12 persons, but that does not automatically undermine the requirement in Rule 26.01 that the state and the court also approve of the reduction in jury size.

Second, interpreting these provisions to allow a defendant the unilateral right to reduce the size of a jury "[a]t any time before verdict" places the state at a distinct strategic disadvantage and potentially compromises the voir dire system by giving a defendant absolute control of the size of the jury. *See* Minn.R.Crim.P. 26.01, subd. 1(4). The present case is illustrative of the potential for unfairness. Here, both parties conducted voir dire directed to the selection of 12 jurors and alternates. After defense counsel used 11 of his 15 peremptory challenges in selecting seven jurors, while the state had only exercised one peremptory strike, defendant moved for a trial by a six person jury. Clearly such a surprise tactic allows a defendant to unfairly manipulate the voir dire system.[8]

There is no constitutionally guaranteed right to reduce the size of the jury unilaterally, and therefore the trial court did not err in its decision on this issue.

## II. *ANONYMOUS JURY*

■ We next consider McKenzie's challenge to the use of an anonymous jury. The

---

(a) Waiver Generally. The defendant, with the approval of the court may waive jury trial provided the defendant does so personally in writing or orally upon the record in open court, after being advised by the court of the right to trial by jury and after having had an opportunity to consult with counsel.

**8.** Recently we amended the Jury Management Rules to clarify that the Minnesota Rules of Criminal Procedure control as to the necessary procedure for determining jury size. *See* Minn.

Gen.R.Prac. 802(i) (1995). The relevant portion of the current rule provides:

> In a criminal action where the offense charged is a felony, a petit jury is a body of 12 persons, **unless a different size is established in accordance with the Minnesota Rules of Criminal Procedure.**

*Id.* (emphasis added). As a result, it is clear that, effective January 1, 1994, a criminal defendant does not have the right to unilaterally reduce the size of the jury.

trial court first discussed the use of an anonymous jury with the parties during a pretrial hearing on August 13, 1993. On August 30, 1993, the trial court gave preliminary instructions to the entire jury pool of 59, including a brief explanation for using anonymity. The trial court then held a hearing with both parties to discuss the basis and procedure for impanelling an anonymous jury. Defense counsel objected to an anonymous jury because of the impact on the presumption of innocence, the lack of showing of jury tampering and the impersonal nature of not being able to refer to jurors by name in voir dire. The state argued that anonymity was necessary based on safety concerns stemming from the murder of Vice Lord Ed Harris, the extensive media attention and the need to protect the privacy of the jurors. At the end of the hearing the trial court determined, on its own initiative, to impanel an anonymous jury.

McKenzie contends that impanelling an anonymous jury destroyed the presumption of innocence, consequently denying him the fundamental right to a trial by an impartial jury. McKenzie argues, in sum, that there was not a sufficient factual basis to justify the impanelling of an anonymous jury, that the state failed to demonstrate that all reasonable alternatives were inadequate and that the trial court's instruction not only failed to limit any prejudicial impact of the anonymous jury, but actually exacerbated the potential problem.

The right to a trial by an impartial jury is a fundamental guarantee of both the United States and Minnesota Constitutions. U.S. Const. amend. V and VI; Minn. Const. art. 1, § 6. *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976); *State v. Hamm*, 423 N.W.2d 379, 385 (Minn.1988). Integral to a fair trial is the preservation of the presumption of innocence. *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 402, 39 L.Ed. 481 (1895). In the case of *State v. Bowles*, 530 N.W.2d 521 (Minn.1995), we announced the proper analytical framework for determining when an anonymous jury so burdens the presumption of innocence as to undermine the fairness of the fact-finding process, in violation

of the constitutional right to a fair trial. Adopting principles developed in federal case law, we said that, first, the trial court must determine that there is strong reason to believe the jury needs protection from external threats to the members' safety or impartiality. There need be no written findings as to the basis for this decision, but the record must provide a clear and detailed explanation of the facts underlying the decision, and the decision will be reviewed under an abuse of discretion standard. *Id.* at 530.

Second, the trial court, having properly made a decision as to the need for an anonymous jury, must take reasonable precautions to minimize any possible prejudicial effect on the deliberations of the jury, including, at a minimum, voir dire directed to the effect of this decision on the impartiality of the jurors and instructions designed to eliminate any implication as to defendant's guilt. *Id.*

Applying this rule to the facts here, we find no violation of the constitutional guarantee of a fair trial by an impartial jury. While trial courts in the future will no doubt follow the more detailed procedures spelled out in *Bowles*, we conclude that the actions of the trial court in this matter satisfy constitutional requirements. We recognize that in analyzing the first prong the trial court must balance the need for jury protection against the potential infringement on defendant's presumption of innocence. In *Bowles*, the first of three cases involving defendants charged in connection with the Haaf murder, we carefully articulated certain situations which tip the balance in favor of an anonymous jury, thus satisfying the first prong. *See id.* at 531. This case is substantially similar.

Here, the trial court noted that the case was one of a series of trials associated with the murder of Officer Haaf and that in the other trials an anonymous jury was used, based on concerns over safety and possible outside influence on the jury. The court indicated that it was not aware of any incidents of outside influence in the two previous trials, but that the concern remained. The court's primary concern appeared to be improper influence by the media and outside demonstrators on the jury. Further, by ac-

knowledging "legitimate issues raised by the State" and "legitimate concerns over safety," the court also appeared to be relying on safety concerns stemming from the murder of Ed Harris. The retaliatory nature of that murder is a legitimate supporting basis for the court's decision. While we would urge trial courts in the future to provide more detail as to the basis for their decisions, we conclude that the trial court's statements meet the "strong reason" prong of the test, "in the light of reason, principle and common sense." *State v. Bowles*, 530 N.W.2d 521, 531 (Minn.1995) (quoting *United States v. Thomas*, 757 F.2d 1359, 1363 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985), and *cert. denied*, 479 U.S. 818, 107 S.Ct. 78, 93 L.Ed.2d 34 (1986)).

■ We also find sufficient compliance with the second prong, requiring reasonable precautions to minimize the impact on the presumption of innocence. Generally the second prong of the test is satisfied if the court employs the following types of precautions to minimize the prejudicial effect of the anonymous jury: 1) extensive voir dire of the jurors to expose bias; and 2) instructions from the trial court designed to eliminate any implication as to the defendant's guilt. *See Bowles* at 530–31; *United States v. Eufrasio*, 935 F.2d 553, 574 (3d Cir.), *cert. denied*, 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991); *Thomas*, 757 F.2d at 1364–65.

In the present case, the trial court used both types of precautions to limit any prejudicial effect of impanelling an anonymous jury. In addition to mentioning anonymity to the entire jury pool during the preliminary instructions, the trial court also read an instruction on this issue to each individual juror before voir dire began. The instruction, agreed to by both parties, essentially informed the venire members they would remain anonymous to shield them from media harassment and to ward off curiosity that might infringe on their privacy. Secondly, as required by *Bowles*, voir dire in this case, directed specifically to the issue of juror anonymity, demonstrated the jury's under-

standing that the basis for the anonymous jury was a concern about outside influence from the media or others. The voir dire of the jurors included a 20 page written questionnaire and thorough questioning regarding their ability to judge impartially. Finally, at the close of trial, the jury was properly instructed on the presumption of innocence and the state's burden to prove McKenzie's guilt beyond a reasonable doubt. We also note that, upon defense counsel's request, the trial court specifically declined to instruct jurors that their anonymity should have no bearing on defendant's presumption of innocence. The trial court record reflects a clear effort to take reasonable precautions to minimize any prejudicial effect of an anonymous jury. As a result, we conclude that the second prong is satisfied, as well. The trial court's decision to impanel an anonymous jury did not violate McKenzie's right to trial by an impartial jury.

## III. *JURY SELECTION*

■ The third issue we address is whether the jury selection procedures used in this case denied McKenzie his state constitutional right to a trial by an impartial jury. McKenzie's challenge is directed at two parts of the process. First, he argues that the low response rate to the jury summons created a jury that was essentially made up of "volunteers," and that such a jury may be more likely to convict. *See Glasser v. United States*, 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680 (1942); *Anderson v. Frey*, 715 F.2d 1304, 1307–09 (8th Cir.1983), *cert. denied*, 464 U.S. 1057, 104 S.Ct. 739, 79 L.Ed.2d 198 (1984). Second, he asserts that the excusing of certain jurors during voir dire due to financial hardship made the jury unrepresentative. McKenzie argues that, taken together, these two occurrences led to a jury that did not represent a fair cross-section of the community in violation of Minnesota Constitution Article I, Section 6.

Acknowledging that there is no violation of the jury requirements of the United States Constitution,[9] McKenzie urges us to inter-

---

9. The federal constitutional right has been interpreted as guaranteeing a trial before a petit jury drawn from a venire pool which is reasonably

representative of the community or a fair cross-section of the community. The test established in *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct.

pret the Minnesota Constitution to provide additional constitutional protection, as we have, for example, in *State v. Russell,* 477 N.W.2d 886 (Minn.1991); *Friedman v. Comm'r. of Public Safety,* 473 N.W.2d 828 (Minn.1991); and *State v. Hershberger,* 462 N.W.2d 393 (Minn.1990). For the reasons discussed below we find no violation of the right to trial by an impartial jury afforded by the Minnesota Constitution on the facts presented.

We begin our discussion of this issue with *State v. Williams,* 525 N.W.2d 538 (Minn. 1994), which arose under both the federal and the state constitutions. In that case, involving a challenge to the racial makeup of the venire pool in Ramsey County, we endorsed an approach which allows trial courts to consider a variety of statistical tools in analyzing the "fair cross-section" issue. We also identified as "key" the showing by a defendant that there has been "systematic exclusion" of a group of eligible jurors over time, that is, unfair or inadequate selection procedures by the state. *Id.* at 543. While *Williams'* emphasis on alternative statistical tools to analyze disparities does not fit these facts well, its focus on selection procedures gives us some guidance.

In this case, the record provides no basis, statistical or otherwise, for an assertion that there was a systematic exclusion of a distinctive group.[10] Potential jurors "self-selected" to be non-participants in the jury process, either by simply ignoring the summons to jury duty or by requesting to be excused for reasons of financial hardship. The loss of these jurors to the criminal justice system, and specifically to McKenzie's case, was not the product of a systematic exclusion created by unfair or inadequate selection procedures, but rather occurred because of individual decisions made by potential jurors.[11]

Further, irrespective of the process, there is no indication that any particular socio-economic group was eliminated. There is, of course, no information on the socio-economic status of those who failed to respond to the jury summons, and the record indicates that the jurors excluded for financial hardship were from various socio-economic backgrounds. What they had in common was their inability to be away from their job or profession for a trial that would last several weeks and their request that they be excused. Although in this case it was the trial court and not the jury commissioner who excused the jurors, the circumstances appear to be precisely the type of hardship contem-

---

664, 668, 58 L.Ed.2d 579 (1979), to prove a prima facie case requires: 1) the group alleged to be excluded is a distinctive group in the community, or a cognizable group; 2) the representation of the group in the venire is not fair and reasonable in relation to the number of persons in the community; and 3) the underrepresentation is due to systematic exclusion in the selection process. Generally, federal courts that have reviewed this issue based on challenges other than gender, race and ethnicity have not found distinctive groups or significant underrepresentation. *See, e.g., United States v. Canfield,* 879 F.2d 446, 447 (8th Cir.1989); *Singleton v. Lockhart,* 871 F.2d 1395, 1397–99 (8th Cir.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 207, 107 L.Ed.2d 160 (1989); *Ford v. Seabold,* 841 F.2d 677, 681 (6th Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 334 (1988); *Anaya v. Hansen,* 781 F.2d 1, 5–8 (1st Cir.1986); *Willis v. Zant,* 720 F.2d 1212, 1216–17 (11th Cir.1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3546, 3548, 82 L.Ed.2d 849, 851 (1984).

**10.** It may be possible for a criminal defendant to make an argument that, under the test of *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), lower socio-economic groups are underrepresented in the venire pool.

However, no statistical or other evidence was presented in this case, and we need not take up this question.

**11.** Although the jury selection process in this case violated no state constitutional limits, these facts illustrate the need for improvement in jury compensation. The legislature has made an effort to eliminate some of the financial burdens of serving on a jury by statutorily providing for daily compensation for jury duty and reimbursement for round-trip travel, day care and parking expenses. *See* Minn.Stat. § 593.48 (1994). Nonetheless, the financial hardship of serving on a jury is not equal: small businesses can't afford to pay employees indefinitely, self-employed people often can't be away for several weeks and low-income people (particularly single women with children) need every dollar of their paychecks. If the state expects citizens to willingly meet their civic obligation to serve on a jury, some further effort to alleviate this concern may be necessary. However, such innovation cannot come on a case-by-case basis by requiring financially distressed or otherwise unwilling jurors to serve.

plated by Minn.Gen.R.Prac. 810 (1995), which provides:

> (b) Eligible persons who are summoned may be excused from jury service only if:
>
> \* \* \* \* \* \*
>
> (2) they request to be excused because their service would be a continuing hardship to them or to members of the public and they are excused for this reason by the jury commissioner.

Finally, we agree with the state that a jury process which dragoons into service citizens unwilling or financially incapable of serving is not likely to improve the fairness of the criminal justice system.

■ The Minnesota Constitution, like the United States Constitution, requires only that underrepresentation, even where it is adequately demonstrated statistically or otherwise, not be the result of systematic exclusion. Here, with no evidence of the systematic exclusion of any group, we conclude that McKenzie's constitutional right to a trial by an impartial jury was not violated either by the low response rate to the jury summons or by the exclusion of some venire members on the basis of financial hardship.

### IV. AIDING AND ABETTING INSTRUCTION

■ The next issue McKenzie raises is the trial court's instruction on aiding and abetting.[12] McKenzie argues that the jury instruction was not sufficiently clear with regard to two principles of aiding and abetting. First, he contends that under the instruction given, the jury was erroneously allowed to consider his actions after the commission of the crime. Appellant suggests that the alternative instruction he submitted to the trial court was a more accurate statement of the

law because it delineated between accessories before the fact and accessories after the fact. However, it is well settled that, although being an accessory after the fact is not a crime, a jury is permitted to consider a defendant's actions after the offense is committed as evidence of the requisite *mens rea.* *See* Minn.Stat. § 609.05 (1994); *State v. Goodridge*, 352 N.W.2d 384 (Minn.1984); *State v. Matousek*, 287 Minn. 344, 178 N.W.2d 604 (1970). The trial court's instructions properly treated McKenzie's actions after the crime as one of the things the jury could consider in deciding whether he was guilty of aiding and abetting, that is, whether he had the necessary intent at or before the commission of the crime, not as evidence of being an "accessory after the fact."

■ McKenzie also argues that the instructions failed to state that mere knowledge, or failure to disclose such knowledge, of a crime without more does not impose liability for aiding and abetting. As he points out, our decision in *State v. Ulvinen*, 313 N.W.2d 425 (Minn.1981), held that more than mere inaction or passive approval is required to establish aiding and abetting. *Id.* at 428. Ironically, in the present case the trial court's instruction used language nearly identical to our holding in *Ulvinen* in specifically stating, "The defendant's participation in the crime in order to aid and abet must be more than mere inaction or passive approval." *Compare id.* Thus, we find no error in the trial court's jury instructions under these circumstances.

■ Jury instructions are to be viewed in their entirety to determine whether they fairly and adequately explain the law. *State v. Jones*, 347 N.W.2d 796, 801 (Minn.1984). Under that standard, the aiding and abetting instructions were not in error.

---

**12.** The state argues that McKenzie waived this issue by counsel's failure to object at the time the instruction on aiding and abetting was given to the jury. The general rule under Minnesota case law and Minn.R.Crim.P. 26.03, subd. 18(3), provides that if a defendant fails to object to the jury instructions at trial, his right to contest them on appeal is waived. *See State v. LaForge*, 347 N.W.2d 247, 251 (Minn.1984); *State v. Kelley*, 295 N.W.2d 521, 522 (Minn.1980). However, if the instruction contains an error of fundamental law or a controlling principle, a motion for a new trial adequately preserves the issue for appeal. *See* Minn.R.Crim.P. 26.03, subd. 18(3). Unfortunately, in the present case the substantive in-chambers discussion concerning jury instructions was not put on the record. Thus, on review of the record we are limited to comparing the affidavits submitted by both attorneys at the time of the post-trial motion. Based on the meager record before us, it is unclear whether counsel sufficiently preserved this issue for appeal. Nevertheless, in the interests of justice we consider the issue on the merits.

## V. SUFFICIENCY OF THE EVIDENCE

Defendant's final argument asserts the evidence was insufficient to support the verdict, particularly because the state's case depended heavily on the testimony of Richard, an accomplice, and Loverine Harris, whom the defense argues was also inherently suspect because she aided an offender.[13]

On review by this court of an insufficiency of the evidence claim, we view the record in the light most favorable to the verdict when determining whether the jury acted with due regard for the presumption of innocence and the need to overcome it by proof beyond a reasonable doubt. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989); *State v. Norris*, 428 N.W.2d 61, 66 (Minn. 1988). In cases like this, where much of the evidence is circumstantial, our general standard of review is supplemented by the rule that a conviction based on such evidence will be upheld if a detailed review of the evidence and the reasonable inferences from such evidence are consistent only with the defendants guilt and inconsistent with any rationale hypothesis except that of guilt. *State v. Scharmer*, 501 N.W.2d 620, 622 (Minn.1993). Furthermore here, we must be mindful of the rule expressed in Minn.Stat. § 634.04 (1994):

> A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

This rule exists because the testimony of an accomplice is suspect and likely to have been given in hopes of receiving clemency. *State v. Jones*, 347 N.W.2d 796, 800 (Minn.1984). Corroborating evidence is sufficient to convict if it confirms the truth of the accomplice's testimony and points to the defendant's guilt in some substantial degree. *Id.* Circumstantial evidence indicating the defendant's participation in the crime is sufficient to corroborate the accomplice's testimony. *Id.* at 801.

Keeping in mind our task in determining whether the evidence was sufficient to support McKenzie's conviction for first-degree murder, we conclude that the state proved each element of the crime beyond a reasonable doubt. The accomplice testimony of Richard was clearly corroborated by the testimony of Loverine Harris, Eugene McDaniel and others. Although the evidence linking McKenzie to the crime was circumstantial, it is sufficient to corroborate the accomplice testimony. Furthermore, the trial court specifically instructed the jurors that corroboration of Richard's testimony was required before it could be used as a basis to convict the defendant. The jury was entitled to believe the testimony of Richard, Loverine Harris and others, and disbelieve any contradictory evidence. *State v. Thompson*, 273 Minn. 1, 36, 139 N.W.2d 490, 515 (1966), *cert. denied*, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966). The evidence was sufficient to support the conviction.

In the absence of any reversible error, we affirm McKenzie's conviction.

Affirmed.

ANDERSON, J., took no part in the consideration or decision of this case.

---

**13.** Although defense counsel acknowledges that Loverine Harris' testimony does not actually constitute accomplice testimony because she was not implicated as an accomplice to Haaf's murder, he argues that her testimony should be treated as accomplice testimony.