**STATE of Minnesota, Respondent,**

v.

**James Clinton WREN, Appellant.**

No. A06–1283.

Supreme Court of Minnesota.

Sept. 13, 2007.

Leslie J. Rosenberg, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Attorney General, St. Paul, MN, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

GILDEA, Justice.

Following a jury trial in Hennepin County District Court, appellant James Clinton Wren was convicted of two counts of first-degree premeditated murder for the deaths of Frank Haynes and Raleigh Robinson and one count of attempted first-degree murder. Wren filed a direct appeal to this court, arguing that the district erred by empaneling an anonymous jury and by overruling Wren's *Batson* objections. Wren also argues that the prosecutor committed misconduct, which entitles him to a new trial. In a supplemental pro se brief, Wren also argues that there was insufficient evidence introduced to the grand jury to establish probable cause, that the state failed to prove every element of the charged crime beyond a reasonable doubt, and that the juror questionnaire forms were unconstitutional. We affirm.

On the afternoon of March 4, 2005, Frank Haynes and Raleigh Robinson were shot and killed at the Penn Best Steak House in Minneapolis. A grand jury indicted Wren for the murders of Haynes and Robinson as well as the attempted murder of Antonio Washington. At the time of the shootings, Haynes was seated at the table with Washington and Robinson was nearby. The state argued that Wren intended to shoot Washington but instead shot and killed Haynes and Robinson. The state's theory was that Wren committed the steak house shooting because he believed that Washington shot his brother.

The evidence at Wren's trial showed that in May 2004 Wren's brother was shot in the neck, but authorities were unable to identify the perpetrator. Two of Wren's acquaintances, T.A. and A.J., testified that sometime prior to the day of the shootings at the steak house, Wren stated that Washington shot his brother and he "was going to do something to him" or kill him.

Washington testified that on the day of the steak house shootings, he told three of his friends, Frank Haynes, Cornelius Branch, and Joel White, that he was having problems with Wren's brother. The four men later went to the Penn Best Steak House and were seated at a table when Wren entered, speaking loudly on a cell phone about a gun. Washington testified that Wren walked toward their table and said into his phone, "I kill one of 'em, matter of fact I think I'm look[ing] at one

of 'em right now."[1] Washington stood up and asked, "What's up?" Wren then pulled out a gun and shot approximately three times, before running into the kitchen. Washington testified that he saw blood coming from Haynes's head and then heard more gunshots and saw Wren run across the restaurant and out the emergency exit, still carrying a gun.

Washington and Branch followed Wren out the exit, and Washington testified that he grabbed a gun that Branch was holding and fired two shots at Wren, both missing, before Wren ran around the corner of the building and down an alley. Washington threw down the gun he was holding in a neighboring yard, and the police recovered this gun later.

Branch testified that prior to going to the steak house, Washington said that Wren's brother was after him. With respect to the steak house shooting, Branch testified that he did not see Wren pull out a gun. But he testified that when Wren began shooting, he and Washington went out the emergency exit, where Washington fired a gun. Branch denied that the gun Washington fired was his or that he fired the gun inside the steak house. But the state entered stipulated testimony from an employee of the Hennepin County Attorney's Office into evidence, indicating that Branch had told the employee that he "brought a pistol to the [steak house] and he was the person that fired the weapon inside the restaurant in response to shots fired by [Wren]."

J.A. was inside the steak house at the time of the shootings, and she testified that she heard a man, whom she later identified as Wren, say into his cell phone, "I seen them niggers around the corner" and also something about guns. J.A. then saw a man at a table jump up and say, "[W]hat are you reaching for?" J.A. saw the man pull out a gun and then saw Wren pull out a gun before she ran into the kitchen.[2]

D.B. testified that he saw Wren park his vehicle and enter the building in which the steak house was located. A few minutes later, D.B. saw Wren come out of the building with a gun in his hand. Then, three men came out of the building "kind of quickly like they was chasing." D.B. stated that he started his vehicle and exited the parking lot, and he noticed that Wren was following in the vehicle behind him. Videotape footage from a surveillance camera corroborated D.B.'s testimony that the cars left the parking lot at the same time and the second car followed D.B.'s car for a short period of time. The car Wren allegedly drove, which was registered to his half-brother, was later found abandoned. Subsequently, a forensic scientist performed DNA testing on cigarette butts found inside the vehicle and concluded that the DNA matched Wren's profile.

After the shootings, Wren went to a house located a couple of blocks from the steak house. A.J., who was at this location, testified that she heard Wren say that "[h]e just got out" with "Antonio and them dudes." She also saw Wren with a gun and heard him say that he was going to stash it in the basement.[3]

The state also called T.A. to testify about what she heard Wren say after the

---

**1.** Several witnesses at the steak house corroborated this description of Wren's phone conversation.

**2.** C.H., another witness to the steak house shootings, apparently told police that she saw Wren with a gun but denied this at trial.

**3.** The gun that the state alleges Wren used in the shootings was never recovered.

shootings. When T.A. failed to recall hearing statements from Wren, the state questioned T.A. about the statement T.A. gave to police shortly after the shootings. T.A. admitted that she told police she had heard Wren say, "I just got into it with the niggers who shot my brother" and "I need to get out of here." D.A., an acquaintance of T.A., testified that she heard T.A. identify Wren as the person who made that statement.

On May 3, 2005, Wren was arrested in Chicago. In separate interviews by the FBI and Minneapolis police, Wren told a fairly consistent story. He admitted to being present at the steak house at the time of the shootings but stated that he was not a shooter and denied having a gun. Wren told the FBI that he took a bus to Chicago under a different name after being made aware of a warrant out for his arrest. The warrant was unrelated to the shootings, but Wren told the Minneapolis police that part of the reason he left Minneapolis was because he knew the police were looking for him regarding the steak house murders. Wren did not testify at trial.

The jury found Wren guilty of the premeditated murders of Haynes and Robinson in violation of Minn.Stat. §§ 609.185(a)(1) and 609.11 (2006), and guilty of the attempted murder of Washington in violation of Minn.Stat. §§ 609.185(a)(1), 609.11, and 609.17 (2006). The district court sentenced Wren to two consecutive life sentences for the first-degree murder convictions and a consecutive sentence of 200 months for the attempted first-degree murder conviction.

## I.

■ We turn first to Wren's claim that the district erred in granting the state's motion to empanel an anonymous jury. As a result of granting the motion, only the trial judge, the judge's clerks, and the head of the jury office knew the names of the members of the venire panel and jury. Wren argues that the anonymous jury violated his right to the presumption of innocence and resulted in unfair prejudice.

The United States and Minnesota Constitutions guarantee criminal defendants the right to a fair trial, which includes an impartial jury. U.S. Const. amend. VI; Minn. Const. art. I, § 6; *State v. Bowles,* 530 N.W.2d 521, 529 (Minn.1995). We have acknowledged "the possibility that anonymity may lead jurors to infer that the accused is guilty of the crime charged and thereby burden his presumption of innocence." *Bowles,* 530 N.W.2d at 530. Accordingly, we cautioned in *Bowles* that "[n]ot every trial where there are threats to jurors' impartiality will require juror anonymity." *Id.* at 531.

■ We have instructed that before empaneling an anonymous jury, the district court must "(a) determine[ ] there is strong reason to believe that the jury needs protection from external threats to its members' safety or impartiality; and (b) take[ ] reasonable precautions to minimize any possible prejudicial effect the jurors' anonymity might have on the defendant." *Id.* at 530–31; *see* Minn. R.Crim. P. 26.02, subd. 2(2) (codifying test). We review the district court's decision to empanel an anonymous jury for an abuse of discretion. *Bowles,* 530 N.W.2d at 531.

■ Under the first part of the *Bowles* rule, the district court "must place in the record a clear and detailed explanation of the facts underlying its determination" that the jury needs protection. *Id.* Here, the court gave several reasons for its decision.

First, the court noted that there was "significant pretrial publicity" concerning

the case. As the court noted, the steak house murders were well publicized a year before trial, when the shootings occurred. The court also relied on a newspaper article about the case that was published the weekend before voir dire began. That article described the assault of a potential witness, T.A., and reported that T.A.'s sister had physically assaulted her in an attempt to prevent her from testifying at Wren's trial. But this assault of a potential witness by a member of her family does not warrant the same concern for juror safety as was raised in *Bowles,* where a witness was murdered in retaliation for being perceived as cooperating with law enforcement. *Id.*

The district court's second and third reasons for concluding that the jury needed protection are related. The second reason was that the case involved "an alleged retaliatory shooting, [with] retaliation alleged to be a motive." Third, the court stated that "there's peripheral * * * potential gang affiliation evidence" although "not necessarily and specifically affiliated at any one time to witnesses or defendant." [4]

In *Bowles,* we stated that once evidence of a retaliatory murder came into the trial, "jurors could have reasonably concluded that were they to convict [the defendant], they or their families would be vulnerable to harassment or retaliation" from the

gang involved. *Id.* Nevertheless, not every retaliatory murder involving gang activity merits the extreme measure of empaneling an anonymous jury. *Bowles* was a unique case in that a police officer was shot in the back in a public place. *Id.* at 526. In addition, before trial began, Bowles's co-gang member, who other gang members apparently believed was a police informant, was murdered. *Id.*

In sum as to the first factor, the pretrial publicity and the evidence supporting a concern for juror safety are not similar to that present in the cases where we have sustained the use of anonymous juries.[5]

■ The second part of the *Bowles* test requires the district court to "take[ ] reasonable precautions to minimize any possible prejudicial effect the jurors' anonymity might have on the defendant." *Id.* In *Bowles,* we approved the district court's precautions, which included "inform[ing] the venire they would remain anonymous to shield them from media harassment," allowing both parties to engage in extensive voir dire, and giving a "clear and strong" jury instruction regarding the defendant's presumption of innocence and the state's burden of proof. *Id.* Here, the district court carefully patterned its precautions after those implemented in *Bowles.* The parties were allowed extensive voir dire and given additional preemptive strikes. The district court also gave

---

4. Wren filed a motion to exclude evidence relating to gangs as a motive for the crime, but before the court ruled on the motion, the state declared its intention not to introduce any gang evidence. The state offered to refer to Washington's fear of Wren's brother and his friends, instead of his fear of Wren's gang, which both the court and Wren accepted.

5. We have upheld the use of anonymous juries in only four cases, and they all arose from the brutal murder at issue in *Bowles.* *See State v. Ford,* 539 N.W.2d 214 (Minn.1995) (affirming conviction in the *Bowles* murder

case); *State v. Flournoy,* 535 N.W.2d 354 (Minn.1995) (affirming conviction for murder of a witness); *State v. McKenzie,* 532 N.W.2d 210 (Minn.1995) (affirming conviction for *Bowles); State v. Bowles,* 530 N.W.2d 521 (Minn.1995) (same). Because of the nature of the murders at issue in those cases, we concluded it was reasonable for the trial courts to be concerned that juror safety could impact the fairness of the proceedings. *See Flournoy,* 535 N.W.2d at 362 ("[I]n the event they were to convict defendant [the jurors] too might be the target of some kind of violence.").

appropriate instructions to the jury on the issue of anonymity and the presumption of innocence. We have recognized that if the foregoing precautions are employed, "a presumption exists that actual prejudice has not occurred." *State v. Ford,* 539 N.W.2d 214, 222 (Minn.1995).

■ Wren has not offered any evidence to overcome this presumption. Because Wren has not demonstrated that he suffered actual prejudice from the use of an anonymous jury, we hold that any error in the use of such a jury here does not entitle him to a new trial. *See Bowles,* 530 N.W.2d at 532 (noting failure of defendant to show actual prejudice). We stress that a jury should only be empaneled anonymously under rare and exceptional circumstances, where the jury's need for protection warrants the risk of prejudicing a defendant's presumption of innocence. But because the district court took proper measures to minimize any prejudicial effect and Wren failed to demonstrate actual prejudice, we hold that Wren is not entitled to a new trial.[6]

## II.

■ We turn next to Wren's claim that the district court erroneously overruled his *Batson* objections to the state's peremptory challenges to prospective jurors 17 and 57. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution constrains the use of peremptory challenges to exclude prospective jurors. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90

L.Ed.2d 69 (1986). If the state has a prohibited discriminatory intent for challenging a prospective juror, the defendant is entitled to a new trial. *State v. Greenleaf,* 591 N.W.2d 488, 500 (Minn.1999).

■ We follow the Supreme Court's three-step framework for determining whether a peremptory challenge is motivated by racial discrimination:

> [O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

*Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *see* Minn R.Crim. P. 26.02, subd. 6a(3). We have acknowledged that the district court's ruling on a *Batson* challenge is to be given "great deference" because "the record may not reflect all of the relevant circumstances that the court may consider." *State v. Pendleton,* 725 N.W.2d 717, 724 (Minn.2007). We will not reverse the district court's determination unless it is clearly erroneous. *State v. Taylor,* 650 N.W.2d 190, 201 (Minn.2002).

The state exercised a peremptory challenge to prospective juror 17, who indicated on his questionnaire that he grew up in Somalia and Kenya, and who was listed as

6. The dissent would, in essence, presume that Wren suffered prejudice in this case and place the burden of proving the absence of prejudice on the state. This rule is inconsistent with our precedent. Specifically, in *Bowles,* we said that "the use of an anonymous jury is not an inherently prejudicial practice." 530 N.W.2d at 530. In addition, placing the burden on Wren to show prejudice is consistent with our jurisprudence in other areas outside the context of anonymous juries. *See, e.g., State v. Sanders,* 376 N.W.2d 196, 204 (Minn. 1985) ("Ordinarily, a convicted criminal defendant who seeks a new trial because of alleged trial error bears the burden of convincing the appellate court not only that error occurred but that it was prejudicial.").

black or African American on the juror profile list. Wren objected to the challenge and the district proceeded to analyze the issue consistent with the *Batson* three-part framework.

In order to establish step one, a prima facie case under *Batson,* the opponent of a peremptory challenge must show "(1) that a member of a protected racial group has been peremptorily excluded from the jury and (2) that circumstances of the case raise an inference that the exclusion was based on race." *State v. Blanche,* 696 N.W.2d 351, 365 (Minn.2005). The fact that the prospective juror is a member of a racial minority, alone, does not raise an inference that the exclusion was based on race. *State v. Reiners,* 664 N.W.2d 826, 831 (Minn.2003). Wren argued that prospective juror 17 had answered many questions in the same way as other jurors, who were not challenged, and that there was no reason other than race for the state to exercise a peremptory challenge. The district court concluded that Wren established a prima facie case under step one of the analysis.

Under step two of the *Batson* analysis, the state must "come forward with a race-neutral explanation." *Purkett,* 514 U.S. at 767, 115 S.Ct. 1769. The explanation does not have to be persuasive or even plausible. *Id.* at 767–68, 115 S.Ct. 1769; *Reiners,* 664 N.W.2d at 832. Here, the state asserted that the prospective juror had language issues and expressed its concern that this prospective juror did not give responses in full sentences and struggled with the defense's questions about proof beyond a reasonable doubt. The district court accepted the state's reason.

Federal circuit courts have concluded that a prospective juror's difficulty

understanding English is a race-neutral reason under step two of *Batson.*[7] *United States v. Canoy,* 38 F.3d 893, 900 (7th Cir.1994); *United States v. Changco,* 1 F.3d 837, 840 (9th Cir.1993). But as the Seventh Circuit noted, because use of language difficulty as a basis for peremptory strikes may have a disparate impact on racial minorities, who are more likely to be educated in a different language, the district court should closely examine whether the government's reason is "merely a pretext for racial or national origin discrimination." *Canoy,* 38 F.3d at 900.

The *Canoy* examination may be made under step three of the *Batson* analysis, which requires the district court to decide whether the opponent of the challenge has proven purposeful discrimination, by " 'determin[ing] whether the [opponent] carried his burden of proving that the peremptory strike was motivated by racial discrimination and that the proffered reasons were merely a pretext for the discriminatory motive.' " *Pendleton,* 725 N.W.2d at 726 (quoting Taylor, 650 N.W.2d at 202). Wren argues that the state's reason was mere pretext for discrimination because prospective juror 17 had no language problem. In support of his objection, Wren argued that the prospective juror struggled with the concept of proof beyond a reasonable doubt because of the awkward phrasing of the questions, which also confused other prospective jurors who were not challenged by the state.

The district court was able to observe prospective juror 17's oral language skills during voir dire. We give due deference to the district court on this issue because it is difficult to review a record for evidence of a prospective juror's language

---

7. The record in this case also reflects that the parties stipulated to remove one juror for cause because he indicated on his questionnaire that he had trouble with English.

difficulties. The district court observed that in addition to understanding the burden of proof, jurors must communicate well with other jurors when deliberating and need a certain amount of language skill, and prospective juror 17 was not demonstrating that ability. The court also stated that it did not think that prospective juror 17 "exhibited fluency or understanding when he gave his responses," and also that he "was concerned by complex questions" and "was having some communication problems." We hold that the district court's decision to overrule Wren's *Batson* objection to the state's peremptory challenge to prospective juror 17 was not clearly erroneous.

 The state also exercised a peremptory challenge to prospective juror 57, a Native American. On his juror questionnaire, in response to a question about his feelings toward law enforcement officials, prospective juror 57 responded, "Sometimes they are vary [sic] unfair. I don't trust them." The prospective juror also stated that he had been treated unfairly by Minneapolis police. Before questioning began, the state moved that this prospective juror be removed for cause because his questionnaire indicated that he had a bias against the Minneapolis Police Department. The court denied the motion.

During voir dire, prospective juror 57 stated that he felt he had been the victim of racial profiling on several occasions because, while driving, he had been followed by police. But the prospective juror stated many times that he could be a fair juror, even when evaluating the testimony of police officers. When asked if he would prejudge police because he does not trust them, the prospective juror answered, "I guess I could say yes. And I guess I could say no. It's really a hard question * * *." But when asked again if he could believe

police at trial, he stated that he would not prejudge them.

The state exercised a preemptory challenge to the prospective juror at the end of voir dire, and in response the defense raised a *Batson* objection. The district court overruled the objection, finding that Wren had not met his burden at step one of the analysis. In support of his *Batson* challenge, Wren noted that prospective juror 57 is a minority and said that he could be fair and would not prejudge Minneapolis police officers. The district court concluded that Wren did not meet his burden under step one because he failed to show that the circumstances of the case raised an inference that the exclusion of prospective juror 57 was racially-based. The court stated that the entire line of questioning regarding the prospective juror's experiences with police was not about race but rather his feelings toward police, and that after listening to his answers during voir dire, the court felt that there was "suspicion left * * * regarding his ability to judge the testimony of a police officer." Given the deference we give to a district court's findings, we hold that the district court did not commit error under a clearly erroneous standard in overruling Wren's *Batson* objection.

### III.

Wren next alleges that he is entitled to a new trial because of prosecutorial misconduct. For unobjected-to prosecutorial misconduct, we apply a modified plain error test. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn.2006). For objected-to prosecutorial misconduct, we have utilized a harmless error test, the application of which varies based on the severity of the misconduct. *See id.* at 299 n. 4 (discussing two-tiered approach articulated in *State v. Caron*, 300 Minn. 123, 127–28, 218 N.W.2d 197,

200 (1974),[8] and "leav[ing] for another day the question of whether the *Caron* two-tiered approach should continue to apply to cases involving objected-to prosecutorial misconduct"); *see also State v. Cabrera,* 700 N.W.2d 469, 473–74 (Minn.2005) (applying the *Caron* standard to objected-to prosecutorial misconduct).[9] We first address whether there was misconduct, and if so, whether it entitles Wren to a new trial.

*Did the prosecutor commit misconduct?*

Wren contends that there were several instances of prosecutorial misconduct, and he groups them into five different types. We turn now to an examination of each of the five types of misconduct alleged.[10]

■ The first type of misconduct Wren alleges is the prosecutor's references to "unproved threats." We recently noted that evidence of a witness's fears of or threats by a defendant may be relevant to explain inconsistencies in the witness's story. *State v. McArthur,* 730 N.W.2d 44, 52 (Minn.2007). We said, however, that in most cases, such evidence is best limited to redirect, "after cross-examination has made it clear that such testimony is needed to rebut an attack on the witness's credibility." *Id.*

Wren cites the prosecutor's elicitation from Detective Wehr about the demeanor of witnesses C.H. and Washington. The detective testified that these witnesses seemed frightened. But this testimony occurred only after Wren elicited testimony that C.H. and Washington had failed ·to identify Wren during their statements to police. Thus, eliciting the testimony at issue from Wehr was not improper on this record.

■ Wren also refers to the prosecutor's question to Wehr, "have there been continuous threats going on with these folks since the murders at the steak house?" Wren objected to the question as leading, and the objection was sustained. This question was asked during Wehr's testimony as a defense witness. During re-direct, Wren elicited testimony from

---

8. *Caron* sets out the two-tiered approach as follows:

> [I]n cases involving unusually serious prosecutorial misconduct this court has required certainty beyond a reasonable doubt that the misconduct was harmless before affirming. * * * On the other hand, in cases involving less serious prosecutorial misconduct this court has applied the test of whether the misconduct likely played a substantial part in influencing the jury to convict.

300 Minn. at 127–28, 218 N.W.2d at 200.

9. As we noted in *Ramey,* "[o]ur jurisprudence has not been completely consistent on the standard applicable" to our review of prosecutorial misconduct. 721 N.W.2d at 298. For example, even though *Ramey* suggests that the applicability of the two-tiered approach of *Caron* to issues of objected-to misconduct was an open question, we did not apply this approach in *State v. Mayhorn,* 720 N.W.2d 776, 785 (Minn.2006). Instead, in *Mayhorn,* which was issued before *Ramey,* we applied the higher harmless beyond a reason- able doubt standard without reference to the seriousness of the misconduct. Our application of the higher standard in *Mayhorn* was based on *State v. Swanson,* 707 N.W.2d 645 (Minn.2006). There we said that a defendant who shows prosecutorial misconduct "will not be granted a new trial if the misconduct is harmless beyond a reasonable doubt." *Id.* at 658 (internal quotation marks omitted). Because the misconduct in *Swanson* did not meet the higher harmless beyond a reasonable doubt standard, we did not need to discuss whether the misconduct would have warranted a new trial under the lower standard. As discussed below, we apply the same default analysis in this case.

10. While we do not discuss in this opinion every one of the instances of the five types of misconduct Wren cites, we have examined all of Wren's claims. Except as specifically found herein, we hold that the other claims of misconduct are without merit on this record.

Wehr that Antonio Washington had not told Wehr that he was afraid of Wren. Apparently in an effort to respond to this testimony, the prosecutor asked the "continuous threats" question on re-cross. While the question was perhaps inartfully phrased, we conclude that it was not misconduct on this record.

■ The second type of misconduct Wren alleges relates to the prosecutor improperly vouching for the credibility of Branch. The testimony Wren cites is the prosecutor's attempt to challenge Branch's credibility by addressing his changing version of events. The examination appears designed to show that Branch's testimony at trial was not the truth. Thus, the examination is not properly characterized as vouching.

■ The third type of misconduct Wren alleges is that the prosecutor improperly elicited inadmissible evidence of Wren's past crimes. This claim relates to evidence of Wren's flight to Chicago after the shootings. Wren argues that the prosecutor committed misconduct because the district court ruled that "there should be no testimony about appellant fleeing because of a 'warrant or because he knew he'd be arrested and brought into custody.'" This is not an accurate representation of the court's ruling, because the court had concluded earlier that evidence of Wren's flight and arrest was relevant and admissible. Regarding the warrant, the court stated, "I don't think that the jury needs to be aware that it was a felony warrant." Although the record is not completely clear, it appears that the court ruled that the prosecution could not introduce evidence that Wren was arrested in Chicago because of a *felony* warrant. Wren does not contend that the prosecutor referred to a felony warrant during trial. Thus, we conclude that the prosecutor did not elicit inadmissible evidence of Wren's past crimes.

■ The fourth type of misconduct Wren alleges is that the prosecutor improperly elicited prejudicial evidence with no probative value. Specifically, the prosecutor asked both FBI Agent Stover and Detective Wehr whether Wren was advised of his *Miranda* rights and whether he waived those rights before their respective interviews of Wren in Chicago. We have stated that *Miranda* questions may be appropriate in order to inform the jury that law enforcement did not impermissibly interrogate the defendant. *See State v. Combs*, 292 Minn. 317, 322, 195 N.W.2d 176, 179 (1972) (concluding that police officer's testimony that defendant was given *Miranda* warnings was proper foundation for admission of defendant's statement to the officer). These questions therefore do not constitute misconduct.

■ Wren's other allegation of prejudicial evidence involves the direct examination of Wehr, during which the prosecutor elicited testimony that Wren stated that he was speaking to his girlfriend on his cell phone at the steak house. Wehr testified that cell phone records suggested that Wren was actually speaking to someone else. The prosecutor then asked Wehr what significance he placed on a suspect's statement that can be proven false. Wren objected, but the district court overruled the objection. Wehr responded, "To me it's almost like a confession." Wren argues on appeal that "what was essentially not an inculpatory statement was pronounced to be the functional equivalent of a confession * * *." As noted, the district court overruled Wren's objection, and Wren has not challenged this ruling on appeal. But the question does seem designed to elicit testimony from one witness (Wehr) about the credibility of another (Wren). We have said that, in general,

one witness is not permitted to testify about the credibility of another witness. *See State v. Pilot*, 595 N.W.2d 511, 518 (Minn.1999) (noting that in general "were they lying" questions are improper); *Van Buren v. State*, 556 N.W.2d 548, 551 (Minn.1996) (concluding that prosecutor's elicitation of testimony from witnesses that they believed the victim's version of events was improper); *State v. Myers*, 359 N.W.2d 604, 609–10 (Minn.1984) ("With respect to most crimes the credibility of a witness is peculiarly within the competence of the jury, whose common experience affords sufficient basis for the assessment of credibility."). The prosecutor's question, therefore, which appears to have been designed to admit evidence that under our general rule should not have been admitted, was improper.

■■■■ The fifth type of misconduct Wren alleges relates to the prosecutor's closing argument. Specifically, Wren cites to the prosecutor's references during closing argument to north Minneapolis, the neighborhood where the shootings took place. We have stated that where "the prosecutor invited the jurors to view the entire occurrence as 'involving three young black males in the hood in North Minneapolis,' a world wholly outside their own," the remark "ask[ed] the jury to apply racial and socio-economic considerations that would deny a defendant a fair trial." *State v. Ray*, 659 N.W.2d 736, 747 (Minn.2003). But where a prosecutor's comments that the defendant was not from the same world as the jurors "[do] little more than prepare the jury for evidence of an unfa-

miliar world involving drugs," such comments are not misconduct. *State v. Robinson*, 604 N.W.2d 355, 363 (Minn.2000).

Here, the references to north Minneapolis appear on only three pages of an almost 70–page argument, and the prosecutor appears to have had a justifiable reason for his north Minneapolis references, because they were used to explain inconsistencies in witnesses' stories.[11] Like the prosecutor in *Robinson*, it appears that the prosecutor was providing context for why witnesses were reluctant to cooperate or changed stories between police interviews and grand jury testimony and trial, specifically because they came from a high-crime neighborhood, which may create reluctant witnesses. There were no references to the racial or socio-economic background of the witnesses or Wren, and the prosecutor did not appear to imply that Wren should be convicted because he was from this environment.

■■■■ But in the same line of argument, the prosecutor noted to the jury that in the juror questionnaires, they were all asked, "Is there a place in Minneapolis where you would prefer not to go?"[12] The prosecutor then stated that "most, if not all of you, said north Minneapolis. Well, this is north Minneapolis folks." Wren did not object to this statement, but it does seem to have been designed to appeal to jurors' prejudices and it goes beyond the evidence. It was therefore arguably improper. *See State v. Clark*, 296 N.W.2d 359, 371 (Minn. 1980) (noting that prosecutor's closing argument should be based on the evidence

---

11. For example, the prosecutor described that the witnesses were fearful because they "live in that environment and recognize that you can die just because you're having lunch and you're in the wrong place * * *." The prosecutor also described one of the state's witnesses as being a "product of the environment that he lives in."

12. The actual question on the juror questionnaire was, "Are there areas in the City of Minneapolis that you might refuse or be afraid to go into during certain times of the day?"

and "not be calculated to inflame the passions and prejudices of the jury against the defendant").

■ Also regarding closing argument, Wren points to the prosecutor asking the jury to recall Wehr's testimony that after Wren's brother was shot in the neck, "there was no investigation because there was no assistance" from witnesses. The court sustained Wren's objection to this argument as being improper and a misstatement of facts. Then the prosecutor stated that Wehr "testified as to why there was no investigation," and the court overruled Wren's objection to that statement. The prosecutor then continued, saying, "This is what [Wehr] testified to and this is what occurs: Rather than coming to the police and settling this so that there's no more bloodshed, too often it is taken to the streets." To this, the court sustained Wren's objection that the prosecutor was engaged in improper argument. Wehr did not testify that rather than coming to police, too often people handle things on their own (i.e. taking it to the streets and causing more bloodshed). Accordingly, to the extent the prosecutor argued that Wehr offered this testimony, this argument was improper. It was also improper for the prosecutor to tell the jury "this is what occurs." *See State v. Bradford*, 618 N.W.2d 782, 799 (Minn.2000) (speculating about events with no factual basis in record is misconduct).

*Does the misconduct entitle Wren to a new trial?*

As set forth above, we have concluded that the prosecutor's conduct was improper in three instances, one to which there was no objection and two to which objections were lodged. We proceed now to an analysis of whether Wren is entitled to a new trial based on these three instances.

■ We analyze the unobjected-to misconduct, the prosecutor's closing argument comments that the jurors said on the questionnaires that they did not want to go to north Minneapolis, under a modified plain error test. *See Ramey*, 721 N.W.2d at 302. Under this test, the defendant must establish both that misconduct constitutes error and that the error was plain. *Id.* The defendant shows the error was plain "if the error contravenes case law, a rule, or a standard of conduct." *Id.; see also State v. Dobbins*, 725 N.W.2d 492, 513 (Minn.2006) (finding that misconduct was plain error because it had "already been addressed and disapproved in our case law"). The burden then shifts to the state to demonstrate that the error did not affect the defendant's substantial rights. *Ramey*, 721 N.W.2d at 302.

We conclude that Wren has not met his burden to show plain error. The prosecutor's comment, while perhaps taking the jury momentarily away from the evidence, was made within the context of attempting to explain the shifting stories of one of the state's witnesses, D.B. The comment was not directed at the defendant and it was not made in an effort to get the jury to align themselves with the state and against the defendant. *Cf. Mayhorn*, 720 N.W.2d at 790 (finding misconduct where prosecutor included herself with the jury and argued that the drug world was foreign to all of "us" because such argument "may be an effort to appeal to the jury's passions."). Finally, Wren cites no case, rule, or standard of conduct that he claims was contravened by the prosecutor's reference to the jurors' answers to the questionnaire. Accordingly, on this record we hold that the comment, while improper, does not rise to the level of plain error.

■ Wren objected to the other instances of misconduct, Detective Wehr's commentary on Wren's credibility and the

"taken to the streets" argument in closing. We therefore analyze these instances for harmless error. As we did in *Swanson*, we utilize the higher standard of harmless error, requiring that the error be harmless beyond a reasonable doubt, and examine whether the verdict "was surely unattributable" to the misconduct. 707 N.W.2d at 658 (internal quotation marks omitted).[13]

We recently examined our jurisprudence applying the harmless-error-beyond-a-reasonable-doubt standard and noted that "several factors" are relevant to the analysis. *State v. Caulfield*, 722 N.W.2d 304, 317 (Minn.2006) (concluding the admission of evidence in violation of defendant's Confrontation Clause rights was not harmless error). We look to how the improper evidence was presented, whether the state emphasized it during the trial, whether the evidence was highly persuasive or circumstantial, and whether the defendant countered it. *Id.* at 314. We also noted that the strength of the evidence, while not controlling, was part of the harmless error analysis. *Id.; see also State v. Courtney*, 696 N.W.2d 73, 80 (Minn.2005) (stating that when determining surely-unattributable question "we examine the record as a whole").[14] *Caulfield* did not arise in the context of prosecutorial misconduct. *See Caulfield*, 722 N.W.2d at 306–07. But its discussion relates to the same standard we apply here, so it is appropriate to rely on these same factors in this context.

■■■ In terms of its presentation, the objectionable conduct was brief. The prosecutor did not emphasize or dwell on it. And to the extent the prosecutor was able to get in any evidence through his improper question to Detective Wehr, that evidence was brief. Detective Wehr's commentary on Wren's credibility consisted of his answers to two questions and was a very small part of his lengthy testimony at the trial. This commentary was not persuasive evidence that Wren committed the crimes. Moreover, Wren's credibility was not a central issue in the trial.[15] *Cf. Van Buren*, 556 N.W.2d at 551–52 (concluding that erroneous admission of credibility evidence required new trial because credibility of victim versus defendant was "central issue" in the case). Wren countered the prosecutor's arguments about witness credibility through his counsel's examination of witnesses and closing argument. Finally, the evidence against Wren was very strong.[16] Our analysis of the *Caul-*

13. The parties did not address whether the *Caron* two-tiered standard should be applied or whether the misconduct was more serious or less serious under that standard. Because, as shown below, Wren is not entitled to a new trial under the higher beyond a reasonable doubt harmless error standard, we need not decide whether the *Caron* test retains viability.

14. Indeed, in *State v. Juarez*, we said that "overwhelming evidence of guilt is a factor, often a very important one, in determining whether, beyond a reasonable doubt, the error has no impact on the verdict." ·572 N.W.2d 286, 291 (Minn.1997); *see also State v. Wright*, 726 N.W.2d 464, 478 (Minn.2007) ("The final factor in our harmless error analysis is the strength of the 'other evidence' against Wright * * *.").

15. Wren did not testify. The focus of his defense was that Antonio Washington and Branch were the only two shooters, and that their testimony to the contrary was false.

16. Before the shootings, two witnesses heard Wren threaten to "do something" to or kill Washington. At the steak house, numerous witnesses heard Wren make threatening comments while speaking on his cell phone, and Washington and Branch saw Wren shooting. Another witness, J.A., saw Wren with a gun at the steak house. After the shootings, D.B. saw Wren fleeing with a gun, and two other witnesses heard Wren talk about "having it out" with Washington and his friends and needing to get rid of a gun. Finally, Wren's flight to Chicago provided circumstantial evidence of his consciousness of guilt.

*field* factors leads us to conclude that the jury's verdict was surely unattributable to the two instances of objected-to misconduct. *See Dobbins,* 725 N.W.2d at 507–08 (concluding that verdict was surely unattributable to misconduct where court sustained objections to misconduct and evidence against appellant was strong).

We hold that Wren is not entitled to a new trial because of prosecutorial misconduct.

### IV.

■ Wren also raises three issues in a supplemental pro se brief. First, Wren argues that because his indictment stated that he committed the three crimes *while using a firearm* and because he was charged under Minn.Stat. § 609.11 (2006), the use of a firearm in the three crimes must be submitted to the jury as a separate, substantive offense. The sentences the court imposed were unaffected by section 609.11, subd. 5, a mandatory minimum sentence statute, because the life sentences imposed for premeditated first-degree murder were mandatory and the 200–month sentence was in the presumptive range for attempted first-degree murder. Minn. Sent. Guidelines II.E., II.G. Therefore, there was no need for a jury to find that Wren committed the charged felonies with a firearm and no basis to conclude that subdivision 5 is a separate substantive offense.

■ Second, Wren argues that the evidence presented to the grand jury did not establish probable cause to support an indictment for premeditation and attempted first-degree murder. Wren also argues that the prosecutor prevented the grand jury from seeing exculpatory evidence. An objection to an indictment must be made by a pretrial motion as provided by Minn. R.Crim. P. 10.01. Minn. R.Crim. P. 17.06, subd. 2. A failure to include any objections to an indictment in a motion pursuant to Minn. R.Crim. P. 10.01 constitutes a waiver, unless the objection to the indictment is due to the court's lack of jurisdiction over the offense or the failure of the indictment to charge an offense. Minn. R.Crim. P. 10.03. But for good cause shown, we may grant relief notwithstanding the waiver. *Id.* Wren does not provide a reason why he failed to raise his arguments in a pretrial motion to dismiss, and we therefore conclude that the issues relating to the indictment are waived.

■ Third, Wren argues that the jury selection procedures used in his case were unconstitutional because the potential jurors were asked to identify their races in "qualification questionnaires" sent to prospective jurors. Wren asserts that this violates his equal protection right to a jury that is not selected based on a racial criterion. We have upheld the jury selection process used in Hennepin County against constitutional challenge, although we have not considered this precise issue. *State v. Gail,* 713 N.W.2d 851, 862 (Minn.2006). The record before us does not include the qualification questionnaire that Wren alleges is unconstitutional, and we are therefore unable to determine whether Wren may have been prejudiced by the qualification questionnaire. Because resolution of the claim requires facts not in the record, we deny the claim without prejudice.

We hold that the issues raised by Wren in his supplemental pro se brief do not warrant a new trial.

Affirmed.

ANDERSON, PAUL H., Justice (concurring).

I concur in the result reached by the majority, but I write separately for two reasons. First, I consider the issue of whether the court erred as to the state's

peremptory strike of potential juror 57 to be a much closer question than does the majority. The burden on the objecting party under step one of *Batson* is to show that a member of a protected racial group has been peremptorily excluded. This step presents a relatively low hurdle for getting to steps two and three of the *Batson* analysis. *See generally Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). While I defer—with some reluctance—to the district court's decision to decide this case under step one and thus do not urge a reversal, I write separately to again emphasize that the burden of proof under step one is quite low. Given the consequences that follow when a court errs in its *Batson* analysis, courts must at all times approach step one of the *Batson* analysis with much diligence and never in a doubtful case stop at this step.

The second reason I write separately is to indicate that on the anonymous jury question, I agree more with Justice Page's analysis than with that of the majority. That said, I nevertheless agree with the majority's ultimate conclusion that Wren has failed to demonstrate actual prejudice that would lead to our granting a new trial based on this issue.

PAGE, Justice (dissenting).

I respectfully dissent.

"[C]ourts must be alert to factors that may undermine the fairness of the fact-finding process * * * [and] must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *State v. Bowles,* 530 N.W.2d 521, 529 (Minn.1995) (citation and quotation marks omitted). In *Bowles,* we stated that jury anonymity is not inherently prejudicial, as jurors "need not" take it as a sign that the defendant is guilty or especially danger-

ous, which would burden the defendant's presumption of innocence and undermine his or her right to a fair trial. *Id.* at 529–30. We explained that jurors are "as likely to" conclude that anonymity is employed to shield them from pressure from the media or the public. *Id.* Implied, but unstated in our explanation, is the fact that there is also "some likelihood" that the empanelling of an anonymous jury will result in jurors taking it as a sign that the defendant is guilty and/or not only dangerous but dangerous to the jurors. Thus, even though we require courts to take certain precautions to lessen the potential for prejudice, *id.* at 531, and even though the practice is not *inherently* prejudicial, the *potential* for prejudice will always exist whenever an anonymous jury is used.

Because of this potential for prejudice, we have held that trial courts may use an anonymous jury only when it is adequately justified, i.e., when "there is *strong reason* to believe that the jury needs protection from external threats to its members' safety or impartiality * * *." *Id.* at 530–31 (emphasis added). Without a "strong reason" to justify its use, the empanelling of an anonymous jury needlessly exposes the defendant to the risk of prejudice and an unfair trial. In each of our previous cases involving the use of anonymous juries, we held that there was "strong reason" to believe that the jury needed protection. *See State v. Ford,* 539 N.W.2d 214, 220–21 (Minn.1995); *State v. Flournoy,* 535 N.W.2d 354, 362 (Minn.1995); *State v. McKenzie,* 532 N.W.2d 210, 220 (Minn. 1995); *Bowles,* 530 N.W.2d at 531. In those cases, we held on the facts presented that, because there were strong reasons to believe that the jury needed protection, jury anonymity was justified and therefore review would be for actual prejudice. *See Bowles,* 530 N.W.2d at 530 ("[O]ur review

of the use of anonymous juries shall be for actual prejudice to the defendant.").

This case is different. In this case, as the court acknowledges, there was no strong reason to believe that the jury needed protection. Consequently, Wren was exposed to the risk of prejudice for no reason. When there is a strong reason to empanel an anonymous jury and when the proper precautions are taken, the risk of prejudice is balanced by the need for jury anonymity, and review for actual prejudice is appropriate. However, in a case such as this, when there is no strong reason for exposing the defendant to the risk of prejudice that accompanies jury anonymity, I would place the burden on the state to show that the defendant was not prejudiced instead of requiring the defendant to show actual prejudice in order to obtain relief.