*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1512**

State of Minnesota,
Respondent,

vs.

Joshua Williams Wermers,
Appellant.

**Filed December 19, 2016
Affirmed
Reilly, Judge**

Crow Wing County District Court
File No. 18-CR-13-1180

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Donald F. Ryan, Crow Wing County Attorney, Rockwell J. Wells, Assistant County Attorney, Brainerd, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Andrea Barts, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Connolly, Presiding Judge; Bjorkman, Judge; and Reilly, Judge.

**UNPUBLISHED OPINION**

**REILLY**, Judge

Appellant Joshua Wermers challenges his criminal-sexual-conduct convictions, arguing that the district court violated his constitutional due-process right to present a

meaningful defense by excluding the testimony of his expert witnesses. He also argues that the prosecutor's misconduct during closing argument violated his right to a fair trial. Because we see no due-process violation in the exclusion of the expert-witness testimony and no misconduct in the prosecutor's closing statements, we affirm appellant's convictions.

## DECISION

**A.      The district court did not abuse its discretion by determining that appellant's witnesses are not qualified to assess forensic interviews of child sexual abuse victims under the age of ten.**

Appellant first claims that the district court violated his constitutional due-process right to present a meaningful defense by excluding the testimony of his expert witnesses. We disagree.

In February 2013, R.M.[1] told his mother that appellant, his step-father, sexually abused him. The next day, R.M. told his mother that he lied and that his step-father told him to tell his mother that he "made it up." R.M.'s mother waited two weeks before reporting the abuse to Crow Wing County.

In March 2013, the county assigned a social worker to investigate the allegations and to interview R.M. During the interview, R.M. repeatedly denied being sexually abused until the social worker temporarily left the room and upon returning asked R.M. if he "recently [told his] mom that maybe somebody touched [him] on [his] wenus?" R.M. responded, "Oh yeah . . . . my step-dad was doing it" and then recounted numerous

---

[1] R.M. was under the age of ten at the time.

2

instances of abuse. Crow Wing County later charged appellant with two counts of second-degree criminal sexual conduct.

Before trial, appellant moved the district court to allow his first expert witness, Dr. Paul Reitman, to testify about the potential for the social worker's leading questions to elicit false accusations. After conducting a hearing to determine Dr. Reitman's qualifications, the district court denied appellant's motion, concluding that Dr. Reitman, although highly qualified in some areas, is not an expert witness in the area of "assessing forensic interviews of child sexual abuse victims." Appellant then sought to introduce the testimony of his second expert witness, Dr. Michael Keller, who would testify that the social worker failed to use "best practices" when interviewing R.M. The district court held a second hearing, this time to determine Dr. Keller's qualifications. After the hearing, the district court denied appellant's motion, explaining that "Dr. Keller is not a qualified expert in the best practices for forensic interviews of children under the age of ten alleging sexual abuse."

At trial, the state called the social worker to testify about R.M.'s interview before introducing the videotaped interview to the jury. As part of her testimony, the social worker noted that she completed CornerHouse and First Witness training, which teaches accepted practices used when interviewing child sexual abuse victims. She testified that it is not unusual for a child to deny his original allegations until prompted. And when asked about R.M.'s initial disclosure at trial, that the abuse included oral contact, she indicated that it is not uncommon for child sexual abuse victims to disclose new allegations at trial. She then described her interview with R.M., noting that her question "did you recently tell

3

your mom that maybe somebody touched you on your wenus?" was leading. Because the district court denied appellant's motions to introduce the expert testimony of Drs. Reitman and Keller, appellant argues that he was unable to rebut the social worker's testimony. Consequently, he contends that the district court's exclusion of his experts' testimony violated his constitutional right to present a meaningful defense.

It is well established that criminal defendants are afforded a constitutional due-process right to present a meaningful defense. *See Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 1045 (1973); *State v. Reese*, 692 N.W.2d 736, 740 (Minn. 2005). At a minimum, this includes the right to offer witness testimony. *State v. Mosley*, 853 N.W.2d 789, 798 (Minn. 2014). But this right is not absolute; it is "subject to the limitations imposed by the rules of evidence." *Id.*

There are several established rules of evidence that govern the admissibility of expert testimony. First, rule 702 provides that expert testimony is admissible if a witness is a qualified expert, whose opinion has a reliable foundation, and the testimony offered "will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702; *State v. Obeta*, 796 N.W.2d 282, 289 (Minn. 2011) (articulating this standard). Even if the testimony satisfies this standard, Minnesota Rule of Evidence 403 acts as an additional screen, allowing the district court to exclude otherwise admissible expert testimony if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Minn. R. Evid. 403.

4

The district court's decision to exclude expert-witness testimony regarding proper protocol when interviewing child sexual abuse victims is supported by caselaw. We afford district courts broad discretion in determining whether to admit or exclude the testimony of expert witnesses. *State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn. 1980). And we will not overturn a district court's determination absent a clear abuse of discretion. *Reese*, 692 N.W.2d at 740.

An expert witness is one who is qualified by "knowledge, skill, experience, training or education" to testify about and provide an opinion regarding "scientific, technical or other specialized knowledge." Minn. R. Evid. 702. We do not require that an expert's qualifications stem solely from formal training, but their qualifications must be based on some "knowledge, skill, or experience that would provide the background necessary for a meaningful opinion on the subject." Minn. R. Evid. 702 1977 comm. cmt. After conducting separate hearings to determine the qualifications of appellant's expert witnesses, the district court concluded that appellant's witnesses lacked sufficient practical experience, training, and standardized knowledge to testify as experts in this area and excluded the testimony. We agree.

The district court found, and the record supports, that Drs. Reitman and Keller are experienced clinical psychologists, with notable records of testifying, and noteworthy credentials. But according to the district court's findings, which are supported by the record, both clinical psychologists have limited experience conducting forensic interviews of child sexual abuse victims under the age of ten.

It is well established that we must apply a deferential standard to a district court's evidentiary rulings. We therefore cannot conclude that the district court abused its discretion by concluding that Drs. Reitman and Keller were unqualified to assess the social worker's interview techniques and by excluding their testimony. Because we conclude that the district court did not abuse its discretion, we will not address appellant's additional arguments regarding foundational reliability and helpfulness of the proffered testimony.

Nevertheless, if the district court abused its discretion by deciding to exclude the testimony and thus preventing appellant from presenting a "complete defense," any resulting error was harmless beyond a reasonable doubt. If a reviewing court is satisfied beyond a reasonable doubt that a reasonable jury would have reached the same verdict, even if the expert testimony had been admitted, and the "damaging potential of the evidence fully realized," a violation of appellant's due-process right to present a meaningful defense is harmless. *State v. Post*, 512 N.W.2d 99, 102 (Minn. 1994).

In this case, we are satisfied beyond a reasonable doubt that, if the district court admitted the proposed testimony of Drs. Reitman and Keller, a reasonable jury would have reached the same conclusion. Dr. Reitman's and Dr. Keller's testimony would have been either cumulative or unhelpful. In this case, appellant's trial counsel cross-examined the social worker about her interview practices and CornerHouse and First Witness protocol. And the social worker admitted that her statement to R.M., asking if he recently told his mother that someone abused him, was leading. During his opening and closing arguments, defense counsel also asserted that the social worker improperly interviewed R.M. and failed to follow protocol. We therefore conclude that even if the district court erroneously

excluded the testimony of appellant's expert witnesses, any resulting error was harmless beyond a reasonable doubt.

**B.    The prosecutor did not commit misconduct during closing argument.**

Appellant next challenges his conviction, arguing that the prosecutor's misconduct during closing argument violated his constitutional right to fair trial. We disagree.

During closing argument, the prosecutor made several references to R.M.'s credibility as a witness. First, the prosecutor asserted that R.M. understood his oath and swore to tell the truth. He also suggested that R.M.'s accusation was true because he "had no incentive to lie," false accusations are rare, and R.M. was not sophisticated enough to fabricate such a story. And he addressed inconsistencies in R.M.'s interviews and trial testimony: "[I]f there were many incidents of abuse, there is even more room for inconsistency because it depends on which incident [R.M.] is thinking about when the question is asked." The prosecutor further clarified that when children delay reporting abuse, the potential for recovering physical evidence is reduced: "First, children typically are not sexually abused in front of third-party witnesses. And second, a delayed report is not all that uncommon. And the unfortunate result of a delayed report is the chances of recovering . . . physical evidence is slim to none." He then addressed the implications of R.M.'s allegations, again commenting on R.M.'s credibility:

> When [R.M.] was only seven years old, [he] had to tell his mom and a social worker about embarrassing and shameful sexual conduct that most of us adults would have difficulty talking about.
>
> . . . .

7

And as a result of his disclosure his mom lost a husband, his brother lost a father, and then two years later he had to come to court in front of about 20 people he didn't even know and the stepfather who molested him and tell it all again only to endure cross-examination at the hand of his abuser's attorney.

. . . .

He was subjected to skilled cross-examination. He broke down three or four times on the stand.

. . . .

There isn't any one right way to respond to sexual abuse. Some kids hold it in, some never tell, some tell only when they feel safe. In this case [R.M.] didn't disclose to [the social worker] until he knew that she was already aware of it. Sometimes they might only hint at the abuse wanting to see what the reaction is. Sometimes they don't know what to say until they are asked the right question.

Finally, the prosecutor explained why R.M. did not watch the videotape or read the transcript of the interview before he testified: "I didn't want [R.M.] to testify as to what he said in that videotaped interview, and I didn't want him to testify from a script, and I wanted [R.M.] to testify as to what he actually remembered."

"A prosecutor engages in prosecutorial misconduct when he violates 'clear or established standards of conduct, e.g., rules, laws, orders by a district court, or clear commands in this state's case law.'" *State v. McCray*, 753 N.W.2d 746, 751 (Minn. 2008) (quoting *State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007)). When assessing whether prosecutorial misconduct occurred during closing argument, "we look to the closing argument as a whole, rather than to selected phrases and remarks." *Ture v. State*, 681 N.W.2d 9, 19 (Minn. 2004). The district court has broad discretion to determine the

8

propriety of a prosecutor's statements during closing argument. *McCray*, 753 N.W.2d 751-52.

### a. Objected-to statements

Appellant challenges three objected-to statements, arguing that the statements assert facts not in evidence, vouch for the credibility of the witness, and are impermissible first-person testimony. When reviewing claims involving objected-to prosecutorial misconduct, the Minnesota Supreme Court applies a two-tiered approach determined by the severity of the misconduct. *See State v. Caron*, 300 Minn. 123, 127-28, 218 N.W.2d 197, 200 (1974). Under this approach, if a claim involves unusually serious prosecutorial misconduct, we review the conduct to determine whether it was harmless beyond a reasonable doubt. *Id.* at 127. We review claims regarding less-serious misconduct, to determine whether the conduct "likely played a substantial part in influencing the jury to convict." *Id.* at 128; *see also State v. Wren*, 738 N.W.2d 378, 390 n.9 (Minn. 2007). After *State v. Ramey*, 721 N.W.2d 294 (Minn. 2006), it is unclear whether the two-tiered approach is controlling. *See State v. Carradine*, 812 N.W.2d 130, 146 (Minn. 2012). As a result, we now apply the standard for unusually severe misconduct—certainty beyond a reasonable doubt that the error was harmless. *See Wren*, 738 N.W.2d at 390 n.9. If we conclude that appellant fails to satisfy this standard, we will not address the standard for less-serious misconduct because we are not required to reverse appellant's convictions. *Id.*

### 1. Arguing facts not in evidence

Appellant challenges the prosecutor's statement that, "First, children typically are not sexually abused in front of third-party witnesses. And second, a delayed report is not

9

all that uncommon. And the unfortunate result of a delayed report is the chances of recovering . . . physical evidence is slim to none." The state concedes that this statement was improper, but argues the improper statement was not serious enough to warrant a new trial.

During closing argument, the prosecutor may "present to the jury all legitimate arguments on the evidence, . . . analyze and explain the evidence, and . . . present all proper inferences to be drawn therefrom." *State v. Outlaw*, 748 N.W.2d 349, 358 (Minn. App. 2008) (quoting *State v. Walhberg*, 296 N.W.2d 408, 419 (Minn. 1980), *review denied* (Minn. July 15, 2008)). The record includes evidence that R.M. delayed reporting the abuse, but there is no evidence supporting the frequency of delayed reporting. The district court therefore determined that the prosecutor's comment that delayed reporting "is not all that uncommon" was "troubling." But the district court ultimately concluded that it was "not serious enough to warrant a new trial" because the "bulk" of the prosecution's "closing argument concerning delayed reporting was clearly legitimate." We agree.

Assuming the statement was improper, it was not highly persuasive to the jury and was harmless beyond a reasonable doubt. When assessing improper statements under this standard, we consider "how the improper evidence was presented, whether the state emphasized it during the trial, whether the evidence was highly persuasive or circumstantial, and whether the defendant countered it." *Wren*, 738 N.W.2d at 394. The record indicates that the prosecutor made this statement to explain the lack of DNA evidence and to clarify potential inconsistencies in R.M.'s statements. Appellant's defense counsel also rebutted this statement in closing argument and emphasized the delay,

10

stressing that "[R.M.'s mother] wait[ed] until February 28 to make a report and le[ft] her kids with a person she's testified has improperly touched them." Because this statement was not highly persuasive to the jury, was not emphasized by the prosecutor, and was properly rebutted by the defense, it was harmless beyond a reasonable doubt.

### 2. Vouching for the credibility of a witness

Appellant also challenges the following statement: "The defendant wants you to believe that [R.M.] at seven years old was so sophisticated that he told a lie believable enough to fool his mom, a counselor, [and] a social worker trained to assess allegations of sexual abuse." At trial, appellant objected, arguing that the statement "suggest[s] that [the social worker] was an expert" in violation of the district court's pretrial order. On appeal, the state argues that the district court properly overruled the objection and admitted the statement because, when viewed in context, it does not rise to the level of vouching. We agree.

During closing argument, a prosecutor may not "personally endorse a witness's credibility," but the prosecutor may "argue that a witness was or was not credible." *State v. Jackson*, 773 N.W.2d 111, 123 (Minn. 2009) (citation omitted). "Prosecutorial misconduct occurs when the prosecutor implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to the witness's credibility." *Id.* (quotation omitted). The prosecutor's comment that R.M. was not sophisticated enough to fabricate the sexual abuse does not rise to the level of vouching. When the closing argument is viewed as a whole, this statement explains R.M.'s

11

inconsistencies and argues that R.M. is credible. It does not constitute a personal guarantee of R.M.'s credibility or the social worker's qualifications as an expert.

### 3. Testifying in the first person

Finally, appellant challenges the prosecutor's explanation of how he prepared R.M. for trial: "I didn't want [R.M.] to testify as to what he said in that videotaped interview, and I didn't want him to testify from a script." Here, the state concedes that the statement was improper, but argues the improper statement was harmless beyond a reasonable doubt because the jury instruction clearly directed the jury to disregard any statements by attorneys that were not in evidence.

The jury instructions provided, in relevant part:

> [T]he arguments or other remarks of the attorneys are not evidence. If the attorneys or I have made or should make any statements as to what the evidence is which differs from your recollection of the evidence, you should disregard that statement and rely solely on your own memory. If an attorney's argument contains any statement of law that differs from the law I give you, disregard that statement.

We assume that the jury followed the district court's instructions. *Frazier v. Burlington N. Santa Fe Corp.*, 811 N.W.2d 618, 630 (Minn. 2012) (citation omitted), modified (Minn. Apr. 19, 2012). Because the jury instructions properly directed the jury to ignore the prosecutor's statement, this statement was harmless beyond a reasonable doubt.

Thus, appellant's three objected-to statements are harmless even under the standard for unusually serious misconduct. We therefore will not address the standard for less-serious misconduct because reversal is not required.

12

**b. Unobjected-to statements**

Finally, appellant lists numerous unobjected-to statements and argues that these statements inflamed the passions of the jury, asserted facts not in evidence, and vouched for the credibility of the witness.

Because appellant did not object to the following statements, we apply a modified plain-error test. *Ramey*, 721 N.W.2d at 302. Under this test, appellant must demonstrate that the misconduct constitutes error and that the error was plain. *Id.* Appellant may establish plain error by demonstrating that the misconduct violates caselaw, a rule, or a standard of conduct. *Id.* If appellant is able to establish plain error, the burden shifts to the state to prove that the error did not affect appellant's substantial rights. *Id.* Generally, reversal is warranted only if the prosecutorial misconduct is so prejudicial that it impaired appellant's right to a fair trial. *State v. Johnson*, 616 N.W.2d 720, 727-28 (Minn. 2000).

**1. *Inflaming the passions of the jury***

First, appellant argues that the prosecutor committed misconduct by characterizing the sexual abuse as "embarrassing" and "shameful," and by addressing the impact of the abuse on R.M. and his family:

> [A]s a result of his disclosure his mom lost a husband, his brother lost a father, and then two years later he had to come to court in front of about 20 people he didn't even know and the stepfather who molested him and tell it all again only to endure cross-examination at the hand of his abuser's attorney.
>  . . .
>
> He was subjected to skilled cross-examination. He broke down three or four times on the stand.

We disagree.

13

A "prosecutor must avoid inflaming the jury's passions and prejudices against the defendant," and we must pay "special attention to statements that may inflame or prejudice the jury where credibility is a central issue." *State v. Porter*, 526 N.W.2d 359, 363 (Minn. 1995). "A prosecutor's closing argument should be based on the evidence presented at trial and inferences reasonably drawn from that evidence." *State v. DeWald*, 463 N.W.2d 741, 744 (Minn. 1990).

While testifying, R.M. cried on at least three or four occasions. He also testified that his mother and appellant divorced after the allegation arose, and that he and his brother no longer live with appellant. This commentary on R.M.'s testimony during closing arguments was not plainly improper.

But the prosecutor's use of the words "embarrassing" and "shameful," and the emphasis on cross-examination "at the hands of his abuser's attorney" were, at the very least, inartful, if not improper. When assessing the severity of improper statements, we review them in the context of the closing argument as a whole. *State v. Walsh*, 495 N.W.2d 602, 607 (Minn. 1993). Assuming this statement was improper, it constituted only a small portion of the prosecutor's closing statements. The prosecutor's closing argument continues for 25 pages of the transcript and includes a lengthy description of the state's burden as well as the elements of each offense. The prosecutor also invited the jury to assess R.M.'s credibility based on his videotaped interview, the language R.M. used to describe the abuse, and his delay in reporting the abuse. Consequently, even if this statement was improper, it did not substantially impact appellant's constitutional right to a fair trial.

14

## 2. *Vouching for the credibility of a witness/arguing facts not in evidence*

Finally, appellant asserts that the following statements assumed facts not in evidence or impermissibly vouched for the credibility of the witness.

> Oaths and promises mean something to kids. [R.M.] understood this oath and swore to tell the truth.
>
> . . . .
>
> [A] child is not less believable then an adult just because he's a child. And in many ways, children may be more credible. They have fewer motives to fabricate, they're less cunning, sophisticated, they have a lesser ability to fabricate, and especially younger children.
>
> . . . .
>
> There isn't any one right way to respond to sexual abuse. Some kids hold it in, some never tell, some tell only when they feel safe. In this case, [R.M.] didn't disclose to [the social worker] until he knew that she was already aware of it. Sometimes they might only hint at the abuse wanting to see what the reaction is. Sometimes they don't know what to say until they are asked the right question.
>
> . . . .
>
> It's clear no one told [R.M.] what to say.
>
> . . . .
>
> And if there were many incidents of abuse, there is even more room for inconsistency because it depends on which incident [R.M.] is thinking about when the question is asked.
>
> . . . .
>
> False accusations are rare, and this isn't one of them.
>
> . . . .

> It's far more likely that [R.M.] might not disclose it at all than he would make a false accusation.
>
> . . . .
>
> Cases like this, the victim's word is usually all you have.
>
> . . . .
>
> The fact that the defendant is smart enough to commit this crime outside the presence of any other witnesses and to leave no physical evidence, that's not reasonable doubt.

Again, we disagree.

"[A] prosecutor may make reasonable inferences from the facts." *State v. Rucker*, 752 N.W.2d 538, 551 (Minn. App. 2008), *review denied* (Minn. Sept. 23, 2008). And "prosecutors are not prohibited from arguing that certain witnesses are believable." *Id.* at 552. But vouching occurs when a prosecutor "implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility." *State v. Patterson*, 577 N.W.2d 494, 497 (Minn. 1998).

The prosecutor did not vouch for R.M.'s credibility, but instead asked the jury to evaluate R.M.'s credibility based on his age, testimony, and capacity to understand the importance of truthfulness. The prosecutor also drew reasonable inferences from the evidence admitted at trial. These inferences derived from R.M.'s videotaped interview, the language R.M. used to describe the abuse, his demeanor while testifying at trial, practical wisdom that children exhibit different responses to abuse and may react differently to questions regarding the abuse, and defense counsel's theory that R.M. fabricated the abuse.

16

We therefore determine that the prosecutor drew reasonable inferences and permissibly argued that R.M. is credible.

Thus, reversal is not required and appellant is not entitled to a new trial.

**Affirmed.**